May it please the Court, my name is Matthew Duckworth, and I'm here on behalf of the plaintiff, Lori Mortensen, and I'm going to start with her claims under the Americans with Disabilities Act. And the Court found initially that she was not disabled under the law, meaning that she could not bring a discrimination claim. And in this case, there's evidence from a jury, from which a jury could find that she was substantially limited in the major life activity at issue at this case. And here there was evidence that beginning in January of 2004, she was falling asleep several times a day at work, and this lasted approximately six months. And then in October of 2004, she was prescribed a CPAP machine that helps her breathe while she sleeps, and additional oxygen. And then in January of 2005, she makes a request to be excused from extended staff meetings or meetings that requires an overnight stay. And one of the reasons that she requested that accommodation was because of the possibility of falling asleep during these meetings. So I think this establishes that at least from January of 2004 until January of 2005, that she was having substantial limitations with her sleep. And other evidence that shows that is basically she would sleep all night and she wouldn't be rested, so she was constantly tired. The client conceded that she did not have a record of having a disability. I believe a record of a disability claim is really a history. The law says that what a record means is a history of a disability. And so we're relying on the very same evidence to establish actual disability as a record of disability. There's no additional facts that are relied on to establish the record of disability. In any event, she establishes an actual disability, meaning an impairment that's either permanent or long-term. In this case, I submit that there's evidence that it's at least 18 months and possibly much longer than sleeping. Now in this case, the district court held that your client's testimony in the, I guess in the declaration or in a deposition, I'm not sure which, about her sleep apnea and COPD problems were contradicted by other testimony and statements that she had made. Is it your conclusion, based upon those two statements, that there wasn't a material issue of fact and that she, in fact, had an ADA-qualifying problem with sleep? Well, if I understand your question, I think it's possible the jury could have concluded either way. I think what happened is that the district court spent nearly five pages analyzing these allegedly contradictory statements. There's evidence in there from which a jury perhaps could throw up their hands and say, she can't have it both ways. She can't be limited in sleeping at the same time, not having made mistakes in her job. The court was weighing the evidence at that point, and so there is evidence. Despite the fact that she claims she wasn't having problems performing her job, that does not compel a finding that she wasn't substantially limited in sleeping. And under the current law, the mitigation measures that were taken, what impact, if any, does that have on your case? Well, you do have to look at mitigating measures, and the mitigating measures employed in this case were the CPAP machine, which helps her breathe in additional oxygen. That was prescribed in October of 2004, and the testimony is that it took her about a year until she was able to get a decent night's sleep. And so I believe, based on that, that a jury could find that it wasn't until as late as October of 2005 when the substantial limitation from sleeping had ended, and thus she was substantially limited. What's the period that you feel that the period began and it ended? At the very least, January of 2004 to October of 2005. And you believe that in the record that that is essentially uncontradicted, or certainly that the weight of the evidence would tend to substantiate your position? Yes. I don't want to say it's uncontradicted. There is a statement that after she got the oxygen she was able to, I'm paraphrasing here, but she got a good night's sleep once in a while, and there's evidence that she wasn't able to get a decent night's sleep until a year later. What I'm seeing here is in the supplemental, actually it's a record, that she testified that using the CPAP machine, certainly no later than February 2005, she in quotes actually felt like she had some energy and like she got a good night's sleep. Yes. Do you have anything to the contrary on that? Well, at ER 25, there's evidence that she testified that she was not able to get a decent night's sleep until about a year later, and a year later referring to from October of 2004. I see. So she got a contradictory statement there. Yes. But she originally, didn't her supervisor allow her not to take minutes? And that was the combination you're talking about, not attend long meetings or taking minutes. He did. He allowed her to stop taking notes at these extended meetings. She had two issues. One, she had this productive cough from the COPD, and also she would fall asleep in these meetings. Her supervisor was in Wyoming. She's in Portland, and so she would listen to these meetings via telephone, and so she would be alone and it would be difficult for her to stay awake. But I'm trying to, where's the discrimination? Were they discriminating against her because of her disability? Well, this is a case where Mr. Andreasen, her supervisor, testified that he had compassion for her and allowed, and I believe lived with, had mother with health issues, and so he felt that he was compassionate towards her. Things changed in January of 2005 when she came forth with the request to be relieved from these meetings. He initially granted them to her, but then within two months he changed his mind. Well, can I back you up? Yeah. Before January 2005, didn't he allow her not to attend these meetings and take minutes? He had two other people do it? Correct. In 2004? That's correct. So there's no problem yet. Now you're saying in 2005, go ahead. Exactly. There's no problem before 2005, at least no actions taken against her. And then in, what happens then is, sometime after January 15th, he accuses her of choosing not to take minutes at these meetings. Okay, but by that point, though, at least at some point in the record here, she says as of February 2005, she's sleeping okay. So don't you have a bit of an overlap there where at least by that point, at the point that you indicate that Mr. Andreasen, I think that's the way his name is pronounced, but ceased accommodating her from your perspective, she was okay? Well, I believe she was having difficulty, that the record supports that she was having difficulty sleeping through October of 2005. Okay, well, I thought we talked about that before. At one point, she said as of February 2005, she was okay. You're saying it's later. There is a statement that she was getting some restful nights, and I don't have the exact quote, but there's also evidence that she didn't get a decent night's sleep until October of 2005. So she's still having sleeping problems as of February 2005. Hypothetically, the quote in Excerpts of Record 32 where she said, and I'm quoting, actually felt like she had some energy and like she got a good night's sleep. That was February 2005. So if that were correct, then the period when she was no longer accommodated occurred about that time. That's correct. If that's correct. That's correct, Your Honor. And she was getting direct oxygen or something, I guess, through the CPAP thing at about that time. That was what seemed to make an immediate difference. It helped, yes, Your Honor. And then also at that time after, Andreasen So I think then if you follow the path that we're looking down to see about this case, is she then disabled at that point to the point that she would be discriminated against or retaliated against? And that's the question. Is then she disabled? If before she was, but then she gets better, do you see what we're I understand there's some conflicting testimony, but I believe that if a jury believes that she wasn't getting a decent night's sleep until October 5, then there's still a question of fact as to whether there's a substantial limitation in her ability to sleep. And I think that's consistent with the cases, Michelindan and Head, that are cited in the case. Why don't you hold that good thought and bring it back for the rebuttal. And let's hear now from Mr. Campbell for Pacific Court. Thank you. May it please the Court, Bruce Campbell representing Pacific Court. In this case, the plaintiff, Lori Mortensen, has failed to come forth with evidence to show that she was terminated due to her alleged disability or due to the taking of FIMLA leave. Rather, the evidence showed that Pacific Court terminated Ms. Mortensen for a legitimate, non-discriminatory reason, namely her failure to adequately perform the duties of her job. As a consequence, the District Court correctly granted summary judgment for Pacific Court on all claims. There are a number, as the Court has noted, there are a number of defects with Ms. Mortensen's claims, but the common thread running through all of the claims is really a lack of causation. And the causation question is analyzed under the McDonnell-Douglas burden-shifting framework. In this case, now, to establish her prima facie case of the alleged disability and her termination by Pacific Court. Now, if we assume that the timing alone is sufficient to establish her prima facie case, there's still a problem here, and that's that Mr. Andresen, who is her former supervisor who had the allegedly discriminatory animus, was but one member of a six-person committee that decided to terminate Ms. Mortensen. But he was on that committee, wasn't he? That's correct, Your Honor. He was on that committee, but he was only one of six members, and by the time that that decision was made, he was no longer her supervisor. That had been transferred to a Jim Wagner. And so that fact alone really breaks the causal chain. In the reply brief on appeal, Ms. Mortensen alleged or claims that it was really Mr. Andresen's recommendation to terminate, but I would submit that that's not a correct statement if you look at the... I'm a little troubled, counsel, on the retaliation question about the proximity of when this occurred. Mr. Andresen got hold of basically the supervisor of the Human Resources Department and said, you know, I've got enough of this, I want you to take over, got other people involved, and she right away began to run into problems, if I understand it correctly. Was it two different supervisors after that point? Your Honor, I believe she just had one supervisor, and that was Jim Wagner. Okay, but it didn't last long. What are we talking about, three months or something after the transfer and she's terminated? That's correct. It did not last very long. There was a written warning in April of 2005. I believe in June, when her progress did not improve or performance did not improve, there was a final warning given and that she was terminated in August of 2005. And in part based upon Andresen's prior negative performance reviews. Well, there was progressive discipline and that was really the first big step in the progressive discipline was Mr. Andresen's negative performance evaluation in April of 2005. What I'm concerned about, as you're familiar, under Gilbrook, the collaborative process doesn't necessarily shield the employer from liability. And in this case, the proximity of the time from her departure from Andresen to the other person and Andresen's comment, I gather were very negative, really wanted to get rid of her. I'm just wondering whether she has raised at least a tribal issue of fact on the pretext issue under McDonnell-Douglas. Well, Your Honor, let's assume that she met her initial burden and established a time of patient case. Then the burden shifts to Pacificor at that point to come forth with legitimate non-discriminatory reasons. And I think the record is replete with those legitimate reasons. Some were found in Mr. Andresen's or the negative performance evaluation in April of 2005. I think another place to look would be, there's an email that Mr. Andresen sent to Jennifer Crosby, the employee relations advisor. And that's in the supplemental excerpt of the record at pages 25 through 27. And that lays it out in great detail, all of the specific and numerous problems that Mr. Andresen had with Ms. Mortensen. At what point was this email sent? It was sent, I believe it was April 29, 2005. And that was in response to, after the written warning, Ms. Mortensen told her side of the story, and then Mr. Andresen countered with this letter. But I would submit it's highly probative. It shows, lays out a pretty compelling case of deficiencies in performance in a number of areas. Now that gets us eventually, I assume you're getting there, to the pretext. And how do you, how would you encapsulize the pretext claim that Mr. Duckworth's client is making? I would say the pretext claim is thin. What does she say is pretextual? What she says, well, she has two specific examples. One is Mr. Andresen's statement after the discrimination claim was made that he was hurt, shocked, and surprised by the discrimination claim. Well, I think that's a natural reaction of a supervisor who has never been accused of discrimination before, believe it doesn't undercut the legitimate non-discriminatory reasons. It doesn't show a discriminatory animus. What's the other claim that she has? The other, and this is really vague, it's that Ms. Mortensen claims after she made her discrimination complaint that people started treating her coldly and that all of her duties were relieved. And this is where the district court found, and these are very, very vague statements, she doesn't say who treated her coldly, when she was treated coldly, what that cold treatment consisted of. This is a very vague, nonspecific, nonsubstantial statement, and the district court found that that was contradicted by Ms. Mortensen's own specific statements. For example, three months after she made her discrimination complaint, she described Ms. Jennifer Crosby as fantastic and her new supervisor, Jim Wagner, as the best man she's ever worked for. So it doesn't, it really flies in the face of these general, vague allegations. But I would submit even if there were not that, the more specific contradictory statements, even those statements alone don't meet the specific and substantial standard necessary for the pretext. Mr. Campbell, what's your comment on the following? According to the Extracts of Records 61 through 63, apparently Mr. Mortensen, I'm sorry, Ms. Mortensen, pointed to Andreas' testimony that he didn't know whether he could continue to work with her after her complaint. According to her, he began to look for petty things, such as the graphic above her email signature. He gave her these very inflated performance reviews. Then all of a sudden, he can't work with her anymore. Isn't that at least evidence that a jury ought to consider that perhaps this was pretextual? Your Honor, I would submit that that goes more to make her initial burden of showing the connection or cause, in fact, between the discrimination complaint and the adverse employment action. So you're saying that what she used to show the first prong of McDonald can't be used to also satisfy the pretextual third prong element? I'm not saying that, Your Honor, because I know that that also does come in. But I think that in the face of the very specific, very detailed, and numerous examples of a legitimate reason, essentially a failure to do her job properly, Ms. Mortensen's own view about her excellent work performance, I think, is not of sufficient probative value that it would defeat summary judgment. And I think the district court applied the Reeves v. Sanderson analysis properly. Go ahead. I want to follow up on something Judge Smith was talking about. And I didn't see what the graphic was, but there was an issue about a graphic that Andreasen wanted to raise that she had on her email, and the HR people emailed him back saying, you know, this would seem petty if you would raise that. Isn't that something showing that all of a sudden he's looking for what people might think are ticky-tack reasons not to work with her? Well, I think that if that were the only thing, Your Honor, I would say that that might not be enough. But there are so many other substantial reasons for the negative performance evaluation that Mr. Andreasen, and remember, Mr. Andreasen only gave her a written warning. After then she was transferred, then she received a further problem, or a further discipline, and then finally her termination in August of 2005. So you're saying really because of what happened, it was Mr. Wagner that she ended up working with, right? She got a new supervisor in this case. She did get a new supervisor. She got a new supervisor. She did get that accommodation. Right. So, and she thought it was going to go well in the beginning, and then it turned sour, and you're saying that no jury could reasonably find that there was discrimination or retaliation because that occurred. Yes, Your Honor. I think in a nutshell, based on all of the reasons for termination that Pacific Corps has in the record, and then if you look at the pretext, the evidence of pretext that Ms. Mortensen came up with, it was essentially some vague allegations about... Well, had she not been transferred to Wagner and she had been fired at that point, would you agree that this is a case that should have gone to the jury? If, let's say, in April 2000, she made her complaint in March. April 2005, she's just fired. Right. That's a lot, much more difficult case because I think that would show that the Pacific Corps wasn't bending over backwards to accommodate. So you're saying what really takes this case out of what a jury could reasonably find was when they transferred her to Wagner and she didn't work out with Wagner and she had performance problems there? I would say that was one of the things, Your Honor. As the panel was asking before with Mr. Duckworth, there is a significant underlying question, and that is, was Ms. Mortensen, in fact, disabled as of early 2005? And Your Honor pointed to testimony in the supplemental excerpt of record from Ms. Mortensen where she said that she had some energy and she felt like a good night's sleep after she got supplemental oxygen. Two pages later in the supplemental excerpt on page 34, and this is a medical record. She doesn't have to, in order to establish a retaliation claim, she doesn't really have to have a claim under the ADA, does she? She's just a member of a protected class. Isn't that correct? Well, she has to, her retaliation claim is based on having a disability. Right. I understand that, but I mean, she doesn't have to have, she does not have to state a cause of action under the ADA. Let's just say hypothetically that we were to agree with you that, based upon her statements, that by the time things started to move off-center for her, she was no longer suffering from disability and a major life loss. Based on her performance on the job, based on sleep characteristics, she then slid down the slippery slope that we've just been talking about. Is it your position that unless she qualified for full ADA relief, based upon the prior claim, that she could not have a claim for retaliation? Your Honor, unless she had a record of a disability or was, in fact, disabled by the time that the adverse employment action was taken, yes, I would say that she does not have a claim. Just to back up briefly, it's in the supplemental exit for record 38, and that's where Ms. Mortenson asked by a physician or a nurse, have you noticed improvements in your alertness and energy levels? And she says yes, especially since the addition of supplemental oxygen. So verifying that statement. But what are we to take from that? Improvement, but does it eliminate the problem? You know, I see what you're saying. If she said, I no longer have a problem sleeping, you'd be home free. But can we take that that conclusively shows that she's no longer disabled? Your Honor, I just think that that buttresses her statement in her deposition where she said that as of February, she had some energy and got a good night's sleep. I think that in and of itself is... But what he was saying, what your adversary counsel was saying, is that that was just periodically, that that wasn't continuously she was getting a good night's sleep. Well, if she said it, from time to time I was getting a good night's sleep or periodically I was getting a good night's sleep, that would be correct. But that's not what she said. She said... She said, I actually felt like I had some energy and like I got a good night's sleep. In response to the question was, once they supplemented with pure oxygen, how did that change your condition? So she put no limitations on it whatsoever. The final point I wanted to make is under the FIMLA claim, she has another claim for... And the causation analysis is different as we know under FIMLA. Was it a negative factor? The evidence that the plaintiffs have pointed to were statements made by Mr. Andresen back in... One in 2003, another in 2004. None of that shows a discriminatory animus towards people who take FIMLA leave. It was well in advance of Ms. Mortensen's request for FIMLA leave. And this case really bears no relationship to the Chuang case where there were some very powerful bigoted statements that were made that you could impute a long-lasting animus towards, in that case, people of Chinese origin. But here, there is no evidence that goes to that magnitude. Thank you. Thank you very much. Mr. Duckworth, do you want to use your rebuttal time? Yes, Your Honor. I want to start out, if I may, asking you the same question that I asked you. Mr. Campbell, can your client state a claim for retaliation if she could not, if she cannot show she had a record of disability or an actual disability under the ADA? Absolutely. Disability is not an element of a retaliation claim. What she would need to show is that she engaged in protected activity. Right. And protected activity for purposes of our jurisprudence is what? Requesting accommodation, but I think more importantly was accusing Mr. Andreasen of discriminating against her as long as she brings... Taking the fund. Taking the accommodation away from her. Do you have any case law backing that up? Backing which statement up? Backing up the idea that a protected activity includes taking an accommodation away from your client. I don't have it off the top of my head. What I'm looking for is your stating, which is to the contrary of Mr. Campbell, that in order to meet the first prong of the retaliation claim, all you have to show is a protected activity. He says it's got to be either a record of disability or an actual disability under the ADA. You're saying, no, that's not true. This has to be a protected activity. And what I'm asking you for is, according to your perspective, how is a protected activity defined? Where do we find such a definition? It's invoking the statute. Which statute? The ADA. She has a right to accommodation under the ADA. So you're going back to the ADA. So under your perspective, if a client invokes the ADA, even if she doesn't qualify either as having a record of disability or a disability, if you believe Mr. Campbell's perspective, she is still engaged in a protected activity because she was given an accommodation? Even if she hadn't been given an accommodation, if she requests an accommodation, and I think she needs to request in good faith, you have a good faith belief that you're entitled to protection under the law, in this case an accommodation, and you then request that accommodation, even if you're not entitled to it, you can't be retaliated against for that. Okay. So that's exactly what I'm looking for. Let's just say, arguendo, that your client was not entitled to an accommodation under the ADA. How, in this case, would she be entitled to pursue a retaliation claim if there's no predicate of disability under the ADA? Because of her impairments, her sleep apnea and COPD, she believed that she was a disabled person. So it's what she believes, not what the law provides, whether she meets that requirement. If it's a good faith belief. Do you have any case law that substantiates that? If a person has a good faith belief that he or she is entitled to protections under the ADA, that that is a protected activity that constitutes the first prong of a retaliation claim? I can't give you a case right at the moment, Your Honor. I apologize for that. If you have one, could you send us a 28-J letter promptly? I will, Your Honor. One last thing I'd like to talk about is Pacific Horse claimed they had legitimate reasons to fire her. They may have. You don't even need a reason to fire a person. But in this case, there's evidence that Mr. Andreessen, even if you assume that he gave her inflated performance reviews, which he said, you could say he put up with her. Well, he was willing to put up with her until she made a complaint of discrimination. And at that point, he decided, he said, I had it. It's time to deal with this person. And he immediately gives her a two on her performance evaluation, where she had had threes and a three plus and a four prior to that. And then she is transferred to a new supervisor. And Ms. Mortensen was excited about that at first. She had had some good interactions with Mr. Wagner in the past. But there's also evidence that Mr. Andreessen told Mr. Wagner about her complaint. Now, what's that in the record? I believe it's 107. This is something about Mr. Wagner being concerned about having an employee work for him that. Right. This is in the supplemental excerpts or in the excerpts? The initial excerpts. 63? I believe so, Your Honor. 11 to 14. 11 to 14? I'm on page 107. And Andreessen's referring to Mr. Wagner's response. He says, no, he was not excited by the fact that here was an employee that was going to be reporting to him that had been dissatisfied with their prior supervisor. And so Andreessen talked to him about what he was getting. Okay, this was a report of the HR person, or this is what Andreessen said, or what Wagner said? This is what Andreessen testified about what Wagner said about his reaction to Andreessen. All right, thank you very much, both of you, for your advocacy. The case just argued is submitted. And we will now hear the final case of the day, Fireman's Fund Insurance Company v. Oregon Automobile Insurance Company. Mr. Fogerson, how much time would you like for rebuttal? Four minutes. Four minutes, okay. Thank you.
judges: Thompson, Smith, Moskowitz